UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| JASON SIMMONS § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 3:11-CV-0017-B |
| § | |
| METHODIST HOSPITALS OF DALLAS, § | |
| § | |
| Defendant. § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (doc. 12), filed January 27, 2012. In the Motion, Defendant argues that Plaintiff has failed to present a prima facie case of discrimination, and further that he has failed to rebut Defendant's claims that he was fired for legitimate, non-pretextual reasons. For the reasons stated below, Defendant's Motion is hereby **GRANTED**.

### I.

### BACKGROUND

This is an employment discrimination case that arises from Plaintiff's service as a resident physician. Beginning in July 2007, Plaintiff Jason Simmons served as a resident in Defendant Methodist Hospitals of Dallas' ("Methodist") Internal Medicine Residency Program. Def.'s Mot. for Sum. J. ("Def.'s Mot.") 4. The Internal Medicine Program (the "Program") is a three year program that admits nine residents each year. *Id.* at 5. The Program requires its residents to complete a certain number of elective and mandatory rotations during a residency. *Id.* These rotations are scheduled

by two Chief Residents and a Program Director. *Id.*

As a resident, Simmons agreed to comply with a number of policies and guidelines pertaining to his conduct. *Id.* at 4. For example, Simmons was required to sign a Resident Physician Agreement for each of his three years of training at Methodist. *Id.* On June 7, 2009, Simmons signed the Agreement for the 2009-10 training year. *Id.* He also agreed to abide by the terms of the Employee Handbook as set forth by the Graduate Medical Institution and Program manuals, as well as the Methodist Hospitals of Dallas Internal Medicine Residency Program Policies and Guidelines. *Id.* Simmons received a copy of both of these manuals. App. to Def.'s Mot. 23-24.

During his residency, Simmons' direct supervisor was Dr. Leigh Hunter, the Program Director of the Internal Medicine Residency Program. Def.'s Mot. 4. Dr. Hunter reported to Dr. Manuel Rivera, the Assistant Vice President for Graduate Medical Education at Methodist. *Id.* Methodist's residency programs are governed by the Accreditation Council for Graduate Medical Education ("ACGME"), an independent accrediting organization that evaluates residency programs in the United States. *Id.* The Graduate Medical Education Committee ("GMEC") is the top Methodist committee that runs all graduate medical education at Methodist and includes approximately twenty members, including two elected residents from each program. *Id.* at 5.

Simmons alleges that in spring of 2010, he began to have conflicts with other doctors in part due to miscommunication and also due to a failure of Dr. Hunter and Dr. Rivera to accommodate his requests. Compl. 2-3. On March 22, 2010, Simmons requested that some of his vacation time, originally scheduled for June 2010, be rescheduled to May. Def.'s Mot. 15. Dr. Hunter responded that Simmons would be unable to take off that requested time because doing so would mean that he would violate Methodist's vacation policy. *Id.* On May 14, Simmons met with Dr. Hunter and Dr.

Rivera to discuss which dates he might be able to take a vacation. *Id.* When he attempted to bring up other topics, Dr. Rivera left the meeting. Compl. 3. Simmons also alleges that he was falsely accused of failing to attend his rounds at the hospital as scheduled when he was actually attending meetings with Dr. Rivera. *Id.* On May 17, Simmons was informed that Dr. Hunter wanted to meet with him, but Simmons refused to meet with her alone and requested that Dr. Rivera attend the meeting. *Id.* Then, on May 19, Simmons was called to a meeting with Dr. Rivera, who questioned him about having failed to attend his rounds or to respond to Dr. Hunter's pages. *Id.* Thereafter, Simmons was asked to take a urine test, which he refused. *Id.* at 3. Consequently, Dr. Rivera formally suspended Simmons. *Id.*

One day later, on May 20, 2010, Simmons met with the Executive Committee of the GMEC ("Executive Committee") concerning the conflicts that had arisen. Def.'s Mot. 22. Simmons denied any issues or concerns that the Executive Committee raised. *Id.* After the meeting was over, the Executive Committee unanimously decided that the suspension should remain intact and that the recommendation should be made to the GMEC to terminate Simmons' employment. *Id.* On May 25, the GMEC met to consider the recommendation, and it decided that Simmons should not be permitted to graduate from the Program. *Id.* at 23. Simmons then appealed the decision to the President and Chief Executive Officer of Methodist Health System of Dallas, Dr. Stephen Mansfield. *Id.* Dr. Mansfield met with Simmons and reviewed the applicable documentation before deciding to uphold the decision. *Id.*

Simmons alleges that, beginning in 2010, Methodist began to discriminate in several different ways. First, he alleges that Methodist refused to allow him to work a rotation in Rheumatology. Compl. 2. Second, Simmons alleges that Methodist would not permit him to alter his vacation days

to the point where he was unable to take any vacation. *Id.* Third, he alleges that Methodist's program directors failed to keep an accurate record of Simmons' conference attendance. *Id.* Fourth, he alleges that Dr. Rivera incorrectly stated that Simmons had signed a remediation agreement, which he claims that he never signed. *Id.* And fifth and finally, Simmons alleges that he was unlawfully suspended from the program and eventually terminated. *Id.* at 4.

Simmons filed this lawsuit on January 4, 2011, claiming that Methodist discriminated against him on the basis of race, in violation of 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Simmons alleges claims of disparate treatment as well as disparate impact. *Id.* at 4-5. On January 27, 2012, Methodist filed a Motion for Summary Judgment (doc. 12). In the Motion, Methodist argues that Simmons failed to state a *prima facie* case of disparate treatment, and in the alternative, that Simmons' allegations of disparate treatment are unfounded because it had legitimate and non-discriminatory reasons to terminate his employment. Furthermore, Methodist argues that Simmons has failed to offer any evidence of disparate impact, and has in fact failed to establish a *prima facie* case of disparate impact under 42 U.S.C. § 2000e-2(k). On March 2, 2012, Simmons filed a Response that relied heavily on his deposition testimony in reiterating that he had been discriminated against.[1] The Motion now being ripe, the Court will address the merits of Methodist's claims below.

---

[1] Simmons' Response additionally argues that he was subjected to a hostile work environment because of his race. Resp. 9-11. This claim was not properly pleaded, and Simmons failed to seek leave from this Court to amend his Complaint to add a hostile work environment claim. If a party fails to amend properly as a matter of course, it "may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). Given that Simmons did not obtain Methodist's consent, it must obtain leave from the Court. Simmons has not articulated why he failed to amend his pleading properly, or why doing so in his Response to Defendant's Motion for Summary Judgment would not cause undue prejudice to Methodist. Furthermore, the Court finds that this amendment would be futile. *See Matter of Southmark Corp.*, 88 F.3d 311, 314-15 (5th Cir. 1996). Accordingly, the Court denies Simmons the right to add this claim, and therefore his argument that he was subject to a hostile work environment is hereby **STRICKEN**.

## II.

## LEGAL STANDARDS

The purpose of summary judgment is "to enable a party who believes there is no genuine dispute as to a separate fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Accordingly, Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rather, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Id.* When the movant bears the burden of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's essential elements." *Bank of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) (citing *Martin v. Alamo Cmty. Coll. Dist.*, 35 F.3d 409, 412 (5th Cir. 2003)).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325).

Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Little*, 37 F.3d at 1075. Nevertheless, a non-movant may not simply rely on the Court to sift through the record to find a fact issue, but must instead point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant does provide must raise more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). This evidence must be such that a jury could reasonably base a verdict in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

## III.

## ANALYSIS

A.   *Disparate Treatment*

Simmons alleges that he was the victim of disparate treatment on the basis of his race in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(a)(1) (2006). Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff can "prove a claim of intentional discrimination . . . either by direct or circumstantial evidence." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). When the plaintiff presents a case that relies exclusively on circumstantial evidence, the Court will apply the burden-shifting framework as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

(1973). *McCoy*, 492 F.3d at 556.

Under the *McDonnell Douglas* framework, the plaintiff has the in initial burden to come forward with evidence establishing a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). To make out a prima facie case, the plaintiff must show that he or she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556–57. "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory . . . reason for its employment action." *Id.* at 557. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *Id.* Finally, "[i]f the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose." *Id.* To carry this burden, the employee must demonstrate that each stated reason articulated by the employer was merely a pretext for discrimination. *Id.*

    i.    <u>Adverse Employment Action</u>

Simmons contends that Methodist discriminated against him in several different respects. The alleged discriminatory acts include the following: (1) Methodist refused to allow Simmons to work a rotation in Rheumatology; (2) Methodist would not permit him to alter his vacation days to the point where he was unable to take any vacation; (3) Methodist's program directors failed to keep an accurate record of Simmons' conference attendance; (4) Dr. Rivera incorrectly stated that Simmons had signed a remediation agreement, which Simmons alleges that he never signed; and (5)

Simmons unlawfully suspended from the program and eventually terminated. *Id.* at 4.

The Court must determine whether these allegations constitute adverse actions that amount to a *prima facie* case of discrimination under Title VII. The Fifth Circuit has held that adverse actions under Title VII claims include "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (emphasis omitted) (citation omitted). Other actions – including disciplinary filings, reprimands, and poor performance reviews – do not constitute adverse employment actions, even as they might affect the plaintiff's future employment. *Roberson v. Game Stop/Babbage's*, 152 F. App'x. 356, 360 (5th Cir. 2005).

Simmons' Complaint does not make clear which precise actions constitute unlawful discrimination. However, several of his factual allegations are not adverse employment actions. Claims that Methodist did not calculate his attendance correctly or that it incorrectly believed he signed a remediation agreement are not adverse employment actions. They may be examples of differential treatment, but they are not actionable under the Fifth Circuit's analysis of Title VII. Furthermore, the fact that Simmons did not perform a Rheumatology rotation is not an "ultimate employment decision" because it did not affect his status within the Program. *See McCoy*, 492 F.3d at 559. Nevertheless, the Court will consider Methodist's resistance to permitting Simmons to take vacation days, as well as his eventual firing, as adverse employment actions.[2] Therefore, the Court finds that Simmons has carried his burden to show that he experienced an adverse employment

---

[2] Simmons provides no legal support for the theory that limiting available vacation days may be an adverse employment action, but for purposes of this Order, the Court will assume without deciding that it is. His eventual firing is, of course, an adverse employment action. *See Pegram*, 361 F.3d at 282.

action.

### ii. Preferential Treatment

To establish the fourth element of a *prima facie* case for discrimination, Simmons must show that Methodist gave preferential treatment to similarly situated employees outside the protected class. Until the employee produces evidence that similarly situated employees were treated differently, then there is no inference of discrimination for the employer to rebut. *See Anthony v. Donahoe*, No. 11-30644, 2012 WL 470193, at *3 (5th Cir. Feb. 13, 2012); *see also Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009) ("The question whether [the plaintiff] presented a prima facie case of racial discrimination turns here on whether either or both of the white engineers identified by [the plaintiff] as comparators were similarly situated to him.").[3]

Simmons, in both his Complaint and his Response, has offered no facts to suggest differential treatment on the basis of race. Simmons addresses this only by pointing to statements from his from his own Appendix, which includes an affidavit that states plainly that "other non-African Americans were allowed to take their vacation time" and that other residents who made similar mistakes were permitted to graduate. App. to Pl.'s Resp. 22. Apart from Simmons' own testimony, then, within his

---

[3] Nonetheless, as with other forms of intentional discrimination, providing evidence of "similarly situated employees" or that plaintiff was "replaced by an individual outside the protected group" are not the only methods by which a plaintiff may discharge his burden of establishing a *prima facie* case of intentional discrimination. *See Abdu-Brisson v. Delta Airlines*, 239 F.3d 456, 467-68 (2d Cir. 2001) ("[A] showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the *prima facie* case, is only one way to discharge that burden."). Simmons may also establish the fourth element of his *prima facie* case by showing that he was otherwise discharged because of his race. *See Lawson v. S. Components, Inc.*, 410 F. App'x. 833, 835 (5th Cir. 2011) (holding that the fourth element of plaintiff's *prima facie* case may be satisfied by showing [he] was "otherwise discharged because of [his] race") (citing *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004)). Simmons presents nothing to indicate he is relying upon any theory of liability other than that he was treated differently than similarly situated individuals.

affidavit and deposition, there is no comparative evidence that would lead to an inference that Methodist discriminated against Simmons or treated similarly situated plaintiffs more favorably.

Accordingly, the Court finds that Simmons has not established a *prima facie* case of racial discrimination because he has not demonstrated that other employees outside his protected class were treated differently than he was.

iii.   Defendant's Legitimate, Non-Discriminatory Reasons

Assuming, *arguendo*, that Simmons were able to establish a prima facie case of discrimination, he would not prevail because Methodist has offered a litany of examples of Simmons' misconduct, which Simmons has failed entirely to rebut. Methodist indicates, for example, that Simmons' performance in a mandatory, required exam dropped from the 47th percentile in his second year to the 14th percentile in his third year. Def.'s Mot. 11. Pursuant to Methodist policy, all residents scoring below the 30th percentile are placed on a remediation plan. *Id.* In Simmons' year, four residents scored below the 30th percentile, and all were subject to the remediation plan, yet Simmons refused to sign the plan, and later claimed that he believed he may not be subject to it. Def.'s Mot. 12; App. to Def.'s Mot. 34-35. Thus, there is no evidence that Methodist treated Simmons differently from similarly situated residents, or strayed from its policy in placing Simmons on the remediation plan.

Second, Methodist has offered a non-discriminatory explanation for Simmons' inability to work a Rheumatology rotation. Methodist contends that in March 2010, Simmons wrote to Dr. Hunter and stated that he wanted to work his Rheumatology rotation in April, yet was scheduled to work a rotation in Nephrology that month. Def.'s Mot. 13. Dr. Hunter responded that she had requested information from the program coordinator and attached a copy of his schedule indicating that he was not scheduled to do it in April. *Id.* Despite this, Dr. Hunter contacted Parkland Hospital

("Parkland") to see if it would permit Simmons to complete his Rheumatology rotation there. *Id.*; App. to Def.'s Mot. 91. Because Parkland already had one resident scheduled to perform a Rheumatology rotation in April, it could not accommodate another resident. *Id.* Nevertheless, Dr. Hunter contacted that resident, who willingly gave up her rotation at Parkland so that Simmons could work there. *Id.* However, Dr. Hunter then contacted Dr. Carol Croft, the Program Director of Internal Medicine at Parkland, who refused to allow Simmons to perform the rotation because he had failed tho attend his previously scheduled rotation at Parkland. *Id.* at 13-14; App. to Def.'s Mot. 91. Finally, Dr. Hunter informed Simmons in an email on March 26, 2010, that he could work a Rheumatology rotation at Methodist during April, but Simmons declined. Def.'s Mot. 14; App. to Def.'s Mot. 112. Though Methodist requires its residents to complete a Rheumtaology rotation in order to graduate, it granted Simmons an exception and waived the requirement. Def.'s Mot. 15; App to Def.'s Mot. 114.

Third, Methodist contends that it applied uniform vacation policies to Simmons' requests for vacation days. Pursuant to the Program's Policy and Guidelines, residents do not receive credit for a rotation unless they are present for at least three weeks. Def.'s Mot. 15; App. to Def.'s Mot. 60. On March 23, 2010, Simmons requested a second week of vacation in May, which would have meant that he may not have been present for at least three weeks of his May rotation.[4] Simmons then asked for an exception to this rule. Def.'s Mot. 15; App. to Def.'s Mot. 114. On April 6, 2010, Dr. Hunter notified Simmons that the requirement would not be waived, but in an email notified him that she was "willing to work to work with [him] on the vacation to try to get something figured out for this

---

[4] Simmons was scheduled for night float from April 28, 2010, to May 4, 2010, which meant that he would not have attended his rotation for those days. Def.'s Mot. 15.

month." Def.'s Mot. 15; App. to Def.'s Mot 114-15. The parties continued to correspond regarding potential vacation dates, until Simmons sent Dr. Hunter an email on May 13 that stated that she was "in a state of denial" regarding the situation. Def.'s Mot. 15; App. to Def.'s Mot. 86. The record indicates, then, that Methodist applied its vacation policy as written and Simmons has failed to offer any evidence that it was applied in a discriminatory manner.

Finally, Methodist has offered several reasons to explain its decision to suspend and terminate Simmons. In December 2009, a supervising physician reviewed Simmons' performance and noted that he exhibited an unprofessional attitude in his elective Ambulatory rotation that he labeled "worrisome." Def.'s Mot. 18; App. to Def.'s Mot. 148. Simmons was also noted to have a "tendency to want to give patients what they want, even when such is no in patient's best medical interest." App. to Def.'s Mot. 148. In spring 2010, a number of physicians and other residents noted Simmons' continued poor performance and behavior. Def.'s Mot. 18-19. Simmons also frequently failed to respond to urgent pages or emails from his superiors. Def.'s Mot. 20. On May 14, 2010, Dr. Rivera and Dr. Hunter met with Simmons to discuss his performance and behavior, but Simmons became combative by yelling at Dr. Hunter and accused her of being unfair about his vacation schedule. Def.'s Mot 20; App. to Def.'s Mot. 130. At that point, Dr. Rivera terminated the meeting. *Id.* Later, on May 19, 2010, Simmons met with Dr. Rivera and refused to submit to a drug test, in violation of the Methodist Health System Human Resource Policy. Def.'s Mot 22; App. to Def.'s Mot. 175. Under the this policy, refusal to submit to a drug test results in automatic termination. *Id.* It was at that point that Dr. Rivera suspended Simmons, and that both GMEC and its Executive Committee voted not to permit Simmons to graduate from the Program. Def.'s Mot. 22-23.

In his Response, Simmons fails to deal substantively with these explanations. Rather, he relies

entirely on his own testimony that he was discriminated against because other residents were treated more favorably. Such assertions, unsupported by evidence, do not rebut evidence put forth by the employer that its reasons are legitimate and nondiscriminatory. *See Grimes v. Tex. Dept. of Mental Health & Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996) ("[U]nsubstantiated assertions are not competent summary judgment evidence."); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("'Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'") (quoting *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993)). Where an employee fails to offer any evidence apart from his subjective belief that he was discriminated against, the employer fails to raise an issue of fact. *Id.*

Accordingly, Simmons has both failed to state a *prima facie* case of disparate treatment and to rebut Methodist's legitimate, non-discriminatory reasons for both denying him vacation time and for eventually terminating him. Therefore, Methodist's Motion as to Simmons' claim of disparate treatment under Title VII is hereby **GRANTED**.

B.   *Disparate Impact*

To establish a *prima facie* case of disparate impact, the plaintiff must show that a "facially neutral employment" standard or policy operates "more harshly on one group than another." *Carpenter v. Steven F. Austin State Univ.*, 706 F.2d 608, 621 (5th Cir. 1983). To carry this burden, the employee must establish that a specific practice or set of practices results in a significant disparity between groups. *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1367 (5th Cir. 1992). Therefore, to state a *prima facie* case of disparate impact, a plaintiff must isolate and identify employment practices that are allegedly responsible for statistical disparities. *Wards Cove Packing, Inc. v. Atonio*, 490 U.S. 642,

656 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k).

Simmons has failed to identify any practice or procedure that has a disparate impact on a protected class. The Court cannot recognize any substantive claim for disparate impact in either his pleadings or his Response. Accordingly, Methodist's Motion with regard to Simmons' claim of disparate impact is hereby **GRANTED**.

C.   *Section 1981*

"Claims brought pursuant to Title VII and § 1981 are 'governed by the same evidentiary framework,' such that the analyses under both statutes are substantively the same." *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir.2010) (quoting *Pegram*, 361 F.3d at 281 n.7). Because the Court determined that Simmons' claim fails under Title VII, his § 1981 claims are likewise dismissed. Accordingly, Methodist's Motion as to Simmons' claim brought under § 1981 is hereby **GRANTED**.

## IV.

## CONCLUSION

The Court finds that Plaintiff has failed to plead a prima facie case of discrimination under Title VII of the Civil Rights Act or § 1981. Furthermore, Plaintiff has failed to respond to Defendant's legitimate and nondiscriminatory reasons that support the adverse actions taken against him. Consequently, Plaintiff cannot show that there is a genuine issue of material fact, and therefore cannot survive summary judgment. For the foregoing reasons, Defendant's Motion for Summary Judgment is hereby **GRANTED**.

**SO ORDERED.**

**SIGNED April 26, 2012**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE